**David C. REBER and Pamela D. Reber**

v.

**GENERAL MOTORS CORPORATION**

**and**

**West Fall GMC Truck, Inc.**

**Civ. A. No. 84–0307.**

United States District Court, E.D. Pennsylvania.

Aug. 20, 1987.

gence.

Jonathan L. Wesner, Reading, Pa., for plaintiffs.

George J. Lavin, Philadelphia, Pa., for defendants.

## MEMORANDUM AND ORDER

TROUTMAN, Senior District Judge.

In this products liability action, plaintiff David Reber alleged that the cab of the tractor-trailer which he was driving was not "crashworthy", resulting in a severe injury to his shoulder when he contacted an air-conditioning unit inside the cab after the truck jackknifed on an icy road. The cab was manufactured by General Motors

Corporation in the 1980 model year and sold to Reber's employer, Yellow Freight, by West Fall GMC Truck, Inc. Plaintiff alleged that his injury occurred because the air conditioning unit was too close to the driver's seat, allowing his shoulder to come into contact with its sharp corner and sustain a rotator cuff tear.

At the conclusion of the trial, the Court entered a judgment for the defendant upon the jury's finding, in response to interrogatories, that the GMC tractor was not defective when it left the control of defendant General Motors Corporation. Plaintiff filed a timely motion for judgment n.o.v.[1] or a new trial, contending that certain errors by the Court led the jury to reach a verdict contrary to the law and the evidence. Inasmuch as our review of the record has convinced us that the plaintiffs' assertions of error are incorrect or, in any event, did not affect the outcome of the trial, the motion will be denied.

The specific location of the air-conditioning unit within the truck cab was vigorously contested at trial. Plaintiffs presented evidence that other 1980 tractor cabs, as well as those manufactured in prior and subsequent years, had air-conditioning units located within seven—eight inches of the driver's seat. Plaintiff David Reber also testified that the vehicle he was driving when the accident occurred had the air conditioner in that position. Conversely, defendants sought to establish that the vehicle involved in the accident had an air-conditioning unit located approximately fifteen inches from the driver's seat, where it was unlikely that the driver could have come into contact with it as a result of the accident in which the plaintiff was involved.

■ Plaintiffs' only contention of error that goes directly to the issue of the existence of a defect, upon which the verdict was based, is that the Court should not have permitted the jury to see a videotape of the vehicle involved in the accident, with the air conditioner far to the right of the driver's seat, because it had been shot

three years after the accident. By that time, concededly, the interior of the cab had been completely replaced. Defendants presented documentary and testimonial evidence, however, from which the jury could have inferred that the air-conditioning unit was installed at the same place in the repaired cab as it was prior to the accident. Thus, there was sufficient foundation for showing the videotape of the cab with the interior in the condition for which defendants contended.

■ Plaintiff also argues that he should have been permitted to show a videotape of truck cabs with the air conditioner positioned just to the driver's right. Plaintiff was permitted to show the jury numerous still photographs of different GMC truck cabs, some of them from different model years, with the air-conditioning units in the position plaintiff testified it was on the day of the accident. (See, e.g., Plaintiffs' Exh. 1–10). Further, the Court permitted a jury view of a truck cab which plaintiff contended came off the assembly line at about the same time as the truck involved in the accident and which had the air-conditioning unit placed close to the driver. Jurors were permitted to, and did, climb into the truck cab and reenact plaintiff's version of how the injury occurred. Consequently, we conclude that showing plaintiff's videotape would have been merely cumulative. Refusal to do so, therefore, was not error.

Plaintiffs' second contention of error, that the Court permitted the defendants to use the videotaped testimony of a witness whom the plaintiffs contend was available to testify in court as a live witness, does not even directly address the issue upon which the jury verdict was based.

Just prior to the trial date, plaintiffs took the videotaped deposition of Dr. Charles McCrae, an orthopedic surgeon who treated plaintiff for impingement syndrome. Plaintiff developed the impingement syndrome, defined as a compression of the rotator cuff between the shoulder blade and the upper arm bone, after a subse-

---

**1.** Plaintiff's brief in support of the motion does not present any argument in support of granting judgment n.o.v., concentrating instead on the request for a new trial.

quent accident. He alleged, however, that it would not have occurred absent the prior rotator cuff tear, and thus that it also resulted from the jackknife.

Dr. McCrae was not expected to be within one hundred miles of the courthouse at the time of trial. The doctor had returned, however, by the time defendants proposed to use the videotaped deposition at trial. Plaintiffs, in the meantime, had decided to forego the doctor's testimony entirely.

During the cross-examination of the witness on the videotape, defendants' counsel asked him to describe the cause of a rotator cuff tear, the primary injury alleged to have resulted from the accident. The witness replied that the injury occurs as a result of falling on an outstretched arm. (Defendants' Brief in Opposition to Plaintiffs' Motion, Doc.# 59, Exh. C at 13). That opinion was completely different from the one expressed by the physician who treated the plaintiff for the rotator cuff tear and testified as his medical expert at trial. Defendants used the videotape deposition as part of their evidence to negate the plaintiffs' theory of causation of the injury.

Plaintiffs contended at trial and now contend that the Court should have compelled defendants to produce the witness for live testimony when it was established that he was in the area. When contacted, the doctor indicated that he was not available to testify because of a heavy surgical schedule. Defendants contended that the doctor should not be compelled to appear in court after the trial deposition had been taken and it was understood that he would have no further obligation to testify. (N.T. of 7/21/86 at 31). After an *in camera* view of the tape, the Court permitted the videotape to be shown to the jury during the defendants' case. We found that there were special circumstances, *viz.*, the doctor's busy schedule following his return and the admitted expectation that the videotape would, when filmed, be used at trial. We concluded that these considerations warranted its use in the interest of justice and judicial economy, as permitted by Fed. R.Civ.P. 32(a)(3)(E).

While that rule, understandably and properly, cautions the Court to give due regard to "The importance of presenting the testimony of witnesses orally in open court", *id.*, we are still of the opinion that the use of the deposition was proper under the circumstances. Importantly, the parties had unconditionally agreed, after initial objections by the defendants had been resolved, to present the doctor's testimony by means of videotape. Had the doctor been unavailable under Rule 32(a)(3)(E), plaintiffs could have had no basis for objecting to defendants' use of the taped testimony at trial, nor could they have complained had the defendants compelled the doctor's live testimony. *Feingold v. SEPTA*, 339 Pa.Super. 15, 488 A.2d 284 (1985). In that instance, of course, defendants could have established the doctor's relationship to the plaintiffs, as well as his opinion as to the cause of a rotator cuff tear. The defendants thus lost certain advantages by using the taped testimony.

Moreover, while the rule regulating the use of depositions at trial makes no such distinction, we are convinced that videotaped testimony prepared specifically for use at trial mitigates the concerns militating against the use of depositions in lieu of live testimony. First, although the witness is not physically present in the courtroom, the jury has the opportunity to observe his manner and hear his voice during the testimony. Second, the witness is questioned just as he would be at trial by counsel for both parties. It must be remembered that the deposition was originally taken as a trial deposition for use at trial and was, therefore, ultimately used as agreed by the parties.

The plaintiffs' principal complaint is that Dr. McCrae, who became the defendants' witness, was examined as if he were the plaintiffs' witness as, indeed, he originally was. Plaintiffs contend that they were prejudiced thereby in that they did not have the opportunity to cross-examine. Conversely, the defendants, because they had the witness on cross-examination, had the opportunity to adduce testimony by way of leading questions. Thus, the wit-

ness was not questioned as he would have been had plaintiffs decided not to summon him as a witness and defendants had elected to do so. We find this contention unpersuasive. It was understood that the witness would testify with all objections made and preserved for ruling at trial. Plaintiffs objected to the defendants questioning the witness as to the cause of a rotator cuff tear, but he answered the question subject to having the testimony stricken if the objection was sustained. Similarly, when plaintiffs' counsel heard the adverse testimony, he could then have declared the witness hostile and proceeded as if on cross-examination. Fed.R.Evid. 611(c). To be sure, defendants may have objected, but the testimony would have provided sufficient protection to the plaintiff. That he did not avail himself of the opportunity to pursue it provides no basis for posttrial relief.

Next, we consider the argument that the Court should have sustained plaintiffs' objection to the testimony regarding the cause of a rotator cuff tear as beyond the scope of the direct examination. It is true that plaintiffs did not explore the cause of the original injury with this witness, but they did ask Dr. McCrae if he was aware of the prior injury and whether such an injury would make the impingement syndrome, for which the witness treated the plaintiff, more likely to occur. As we ruled at trial, these questions sufficiently opened the subject matter of a rotator cuff tear and its causation to allow cross-examination on it. In addition, as noted previously, defendants had other, albeit duplicative and time-consuming means for producing the same testimony by the same witness.

■ Assuming, however, that the Court were now to conclude that the testimony should have been excluded for any of the reasons cited by the plaintiffs, we also consider that any error in permitting it was harmless in that it is "highly probable" that any such error did not affect the plaintiffs' "substantial rights". *McQueeney v. Wilmington Trust Co.*, 779 F.2d 916, 924 (3d Cir.1985). As noted, the testimony in question concerns only the issue of cau-

sation. Importantly, and we emphasize that since the jury did not reach that issue, finding at the outset that there was no defect, the testimony is not likely to have affected the outcome.

We have considered, but dismiss as pure conjecture, the plaintiffs' tenuous argument that the jury's viewing of the videotape of Dr. McCrae, followed by defense counsel's remark during closing argument that the witness had originally been called by the plaintiffs, so prejudiced the jury that it rejected the testimony of plaintiffs' engineering expert as to the existence of the defect.

■ There was ample basis for the jury's rejection of the expert testimony if, indeed, that was the basis for the verdict. The jury was instructed that it could reject expert testimony if it found that there was insufficient foundation for the expert's opinion. Here, the jury may well have concluded that the plaintiffs' engineering expert's testimony should be accorded little or no weight on that basis. Plaintiffs' expert, *e.g.*, was uncertain whether he took any measurements of the distance between the driver's seat and the air-conditioning units in 1980 truck cabs. He was not sure which of the photographs he was shown represented 1980 vehicles. (N.T. of 7/16/86 at 53–56). Having reviewed no engineering drawings of 1980 GMC trucks, (*Id.* at 78), he was not prepared to testify to the feasibility of an alternative, safe design, nor did he prepare and present one. (*Id.*) The sum and substance of the expert's testimony was that the defect in the cab was obvious to anyone who observed the positions of the air conditioner and the driver's seat.

■ Moreover, plaintiffs have failed to consider another possible basis for the verdict. The jury could have concluded that the plaintiff's version of how his injury occurred was simply not credible, that he never struck the air conditioner even if it was located close to the driver's seat. As defense counsel noted in his closing argument, medical records obtained from the hospital where plaintiff was treated immediately after the accident revealed that ex-

ternal signs of injury were consistent with his being thrown left and forward and away from the air conditioner rather than right and to the rear and towards the air conditioner. (N.T. of 7/28/86 at 45, 48). Plaintiffs' engineering expert had testified that his opinion that the position of the air conditioner constituted a design defect depended, in part, upon the plaintiff's account of how the accident occurred. (N.T. of 7/17/86 at 126). Thus, if the jury rejected plaintiff's testimony as to striking the air conditioner it logically concluded that the opinion as to the defective design was invalid, as plaintiffs' expert frankly conceded it might be if the information provided by the plaintiff was unreliable. (*Id.*)

In sum, the Court concludes that none of the errors which plaintiffs contend were committed are likely to have affected the outcome of the trial in light of the quantity of conflicting evidence available for the jury's consideration. Consequently, we find no basis for granting a new trial in this case. Therefore, plaintiffs' motion for judgment n.o.v. and, in the alternative, for a new trial will be dismissed.