# Supreme Court of Florida

_____

No. SC11-2511
_____

**FRANK SPECIAL, et al.,**
Petitioners,

vs.

**WEST BOCA MEDICAL CENTER, et al.,**
Respondents.

[November 13, 2014]

LABARGA, C.J.

This case is before the Court for review of the decision of the Fourth District Court of Appeal in Special v. Baux, M.D., et al., 79 So. 3d 755 (Fla. 4th DCA 2011). In its decision, the district court ruled upon the following question, which the court certified to be of great public importance:

> IN A CIVIL APPEAL, SHALL ERROR BE HELD HARMLESS
> WHERE IT IS MORE LIKELY THAN NOT THAT THE ERROR
> DID NOT CONTRIBUTE TO THE JUDGMENT?

Id. at 771-72. We have jurisdiction. See art. V, § 3(b)(4), Fla. Const. As we explain below, we answer the certified question in the negative. We hold that the test for harmless error requires the beneficiary of the error to prove that the error

complained of did not contribute to the verdict. Alternatively stated, the beneficiary of the error must prove that there is no reasonable possibility that the error complained of contributed to the verdict. We begin by setting forth the facts and the procedural history of this case, and we then turn to our discussion of the proper harmless error test in civil appeals. We conclude with our discussion of the harmless error test as applied to the facts of this case. Because there is a reasonable possibility that certain errors by the trial court contributed to the verdict, we reverse the judgment of the district court and remand for a new trial.

In order to avoid any possible confusion stemming from our multiple opinions, we further explain that a majority of this Court (Chief Justice Labarga and Justices Lewis, Quince, and Perry) concur as to the harmless error standard that we announce today. Moreover, a majority of this Court (Chief Justice Labarga and Justices Pariente, Lewis, Quince, and Perry) concur that Petitioner, Frank Special, is entitled to a new trial. While the separate opinions reach different conclusions about the three instances of harmless error argued as grounds for a new trial, as explained more fully below, the plurality opinion grants a new trial based on two harmful errors (the exclusion of testimony relating to the over-diagnosis of amniotic fluid embolus (AFE) and the exclusion of testimony regarding statements made to the medical examiner through her attorney).

## FACTS AND PROCEDURAL HISTORY

In 2003, Susan Special (Susan) died following the delivery of her son. Frank Special (Special), as the personal representative of his wife Susan's estate, sued Dr. Ivo Baux and his related corporations (Baux), and West Boca Medical Center, Inc. (West Boca), for negligence. The Fourth District detailed the following events concerning the birth:

> Susan Special became pregnant at age 38. Five weeks before her due date, [Susan] underwent a cesarean delivery. She was wheeled into the operating room at the Center's labor and delivery suite. Dr. Baux, the anesthesiologist, administered spinal anesthesia. A moment after the placenta was removed, Susan became unresponsive, her blood pressure fell precipitately, and she went into cardiopulmonary arrest. Dr. Baux and hospital staff attempted to revive her. She was temporarily resuscitated and transferred to the Intensive Care Unit, where another cardiopulmonary arrest occurred. Susan died five hours after the delivery.

Id. at 757.

Following Susan's death, Special filed a lawsuit against defendants Baux and West Boca, which alleged that the defendants' negligence caused Susan's death. The lawsuit proceeded to trial, at which the cause of Susan's death was the central issue. Special alleged that Baux and West Boca "were negligent in administering anesthesia, in monitoring [Susan's] system and controlling her fluids during surgery, and in responding to her cardiopulmonary arrests." Id. Baux and West Boca defended against these claims and asserted that Susan's death was

caused by an amniotic fluid embolus (AFE), which is an allergic reaction that develops when a mother's blood mixes with amniotic fluid.

The parties offered conflicting expert testimony concerning the cause of Susan's death. Ultimately, the jury found that Baux and West Boca were not liable for Susan's death, and the trial court entered judgment in favor of the defendants. Special appealed to the Fourth District Court of Appeal, which ultimately considered this case en banc in order "to reconsider other decisions of this court describing the harmless error test in civil cases." Id. at 757. The district court held that "[t]o avoid a new trial, the beneficiary of the error in the trial court must show on appeal that it is more likely than not that the error did not influence the trier of fact and thereby contribute to the verdict." Id. at 771. The district court then applied the "more likely than not" harmless error test to the facts of Special and concluded that it was more likely than not that the alleged errors did not contribute to the verdict. Id. at 772. Having concluded harmless error, the district court affirmed the trial court's judgment in favor of Baux and West Boca.

However, the district court certified to this Court a question of great public importance for the purpose of determining the proper test for harmless error in civil appeals. This Court accepted jurisdiction in order to consider the certified question. In addition to the question certified by the district court, before this Court, Special argues specific instances of harmful error: (1) the exclusion of the

proffered testimony of Dr. Gary Dildy, the defense AFE expert; and (2) the exclusion of evidence related to the alleged witness tampering of Dr. Barbara Wolf, the chief deputy medical examiner. We begin with our discussion of harmless error and the appropriate test for harmless error in civil appeals. We then evaluate the assertions of error in this case in light of the test that we announce today.

## ANALYSIS

### The Test for Harmless Error

The purpose of the harmless error analysis is to "conserve judicial labor by holding harmless those errors which, in the context of [a] case, do not vitiate the right to a fair trial and, thus, do not require a new trial." State v. DiGuilio, 491 So. 2d 1129, 1135 (Fla. 1986). Although the harmless error analysis serves a clear purpose, over time, the test for determining whether error is indeed harmless has been fluid. As we discuss below, this Court has previously set forth the test for harmless error in criminal appeals; however, the question certified by the district court calls upon this Court to announce the correct test for harmless error in civil appeals. Because the certified question presents a pure question of law, our standard of review is de novo. See Jackson-Shaw Co. v. Jacksonville Aviation Auth., 8 So. 3d 1076, 1085 (Fla. 2008) (citing Macola v. Gov't Emp. Ins. Co., 953 So. 2d 451, 454 (Fla. 2006)).

As we consider the proper test for determining harmless error in civil appeals, we are mindful of the harmless error rule contained in section 59.041, Florida Statutes (2003), which provides as follows:

> Harmless error; effect.—No judgment shall be set aside or reversed, or new trial granted by any court of the state in any cause, civil or criminal, on the ground of misdirection of the jury or the improper admission or rejection of evidence or for error as to any matter of pleading or procedure, unless in the opinion of the court to which application is made, after an examination of the entire case it shall appear that the error complained of has resulted in a miscarriage of justice. This section shall be liberally construed.

§ 59.041, Fla. Stat. (2003).[1] Under this rule, appellate courts must evaluate harmless error on a case-by-case basis. Moreover, within the context of each case, in order to determine whether "the error complained of has resulted in a miscarriage of justice," the court's analysis must include an examination of the entire record. What remains, however, with respect to civil appeals, is an interpretation of the language "resulted in a miscarriage of justice"—i.e., the determination of a test for harmless error. Over time, a number of approaches to harmless error have evolved. This evolution has resulted in the application of a variety of tests to determine harmless error.

However, it is appropriate to begin our analysis of the proper test for harmless error in civil appeals with this Court's decision in DiGuilio—a seminal

---

1. The harmless error rule contained in section 59.041 was codified in 1911 and has not substantively changed since that time.

decision in the line of cases interpreting harmless error in Florida, wherein this Court set forth the test for harmless error in criminal cases. In DiGuilio, the defendant was convicted of conspiracy to traffic in cocaine. 491 So. 2d at 1130. On appeal, his conviction was reversed by the district court because the prosecutor improperly "elicited testimony from a witness which could be interpreted by the jury as a comment on [the defendant's] right to remain silent." Id. The district court certified a question of great public importance to this Court, asking this Court to determine whether comments on a defendant's right to remain silent are subject to harmless error analysis, as opposed to a rule of per se reversal. Id. This Court answered the certified question in the affirmative and held that while comments on a defendant's right to remain silent amount to constitutional error, such comments "are subject to harmless error analysis. . . ." Id. at 1137.

Having held that the harmless error test applied to DiGuilio's claim of error, this Court explained that in order to demonstrate harmless error, "the beneficiary of the error [has the burden] to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict or, alternatively stated, that there is no reasonable possibility that the error contributed to the conviction." Id. at 1135, 1139 (citing Chapman v. California, 386 U.S. 18, 24 (1967)). Thus, as opposed to a result-oriented test that is strictly focused on the accuracy of the result or the weight of the evidence, the DiGuilio harmless error test focuses on the effect of the

error on both the trier-of-fact and the result. See Johnson v. State, 53 So. 3d 1003, 1007 (Fla. 2010) (emphasis added) ("The test for harmless error focuses on the effect of the error on the trier of fact."); Burns v. State, 699 So. 2d 646, 652 (Fla. 1997) (noting that reversal is required if the error contributed to the jury's recommendation or the error contributed to the outcome). To emphasize the appellate court's duty to focus on the effect of the error on the trier-of-fact, we explained that the harmless error test is not:

> a sufficiency-of-the-evidence, a correct result, a not clearly wrong, a substantial evidence, a more probable than not, a clear and convincing, or even an overwhelming evidence test. Harmless error is not a device for the appellate court to substitute itself for the trier-of-fact by simply weighing the evidence.

DiGuilio, 491 So. 2d at 1139. Moreover, a determination of whether an error is harmless should not be made in a vacuum. Rather, the

> [a]pplication of [this] test requires an examination of the entire record by the appellate court including a close examination of the permissible evidence on which the jury could have legitimately relied, and in addition an even closer examination of the impermissible evidence which might have possibly influenced the jury verdict.

Id. at 1135. Thus, the appellate court must remain focused on the error itself in order to evaluate whether the beneficiary of the error has proven that there is no reasonable possibility that the error contributed to the verdict.

**The Test for Harmless Error in Civil Appeals**

Although the test for harmless error as stated in <u>DiGuilio</u> applies to criminal appeals, we conclude that this test, with slight modification to accommodate the civil context, is also the appropriate test for harmless error in civil appeals. Thus, today, we announce the following test for determining harmless error in civil appeals:

> To test for harmless error, the beneficiary of the error has the burden to prove that the error complained of did not contribute to the verdict. Alternatively stated, the beneficiary of the error must prove that there is no reasonable possibility that the error contributed to the verdict.

Thus, as in <u>DiGuilio</u>, the responsibility for proving harmless error remains with the beneficiary of the error, who must demonstrate that there is no reasonable possibility that the error contributed to the verdict. As the appellate court evaluates whether the beneficiary of the error has satisfied its burden, the court's obligation is to focus on the effect of the error on the trier-of-fact and avoid engaging in an analysis that looks only to the result in order to determine harmless error. Could the admission of evidence that should have been excluded have contributed to the verdict? Could the exclusion of evidence that should have been admitted have contributed to the verdict? Unless the beneficiary of the error proves that there is no reasonable possibility that the error contributed to the verdict, the error is harmful.

We observe that this test is consistent with the harmless error rule codified in section 59.041, and the Legislature's intent that relief be granted only in the event of "a miscarriage of justice." An appellate court's harmless error analysis is not limited to the result in a given case, but it necessarily concerns the process of arriving at that result. "A large word like justice, incorporated into a rule governing harmless error, compels an appellate court to concern itself not alone with a particular result but also with the very integrity of the judicial process." Roger J. Traynor, The Riddle of Harmless Error 17 (1970). By focusing on the effect of the error on the trier-of-fact, the appellate court will evaluate harmless error in a manner that is consistent with section 59.041.

Moreover, the application of the no reasonable possibility test for harmless error in civil appeals will serve multiple purposes. The test acts in a manner so as to conserve judicial resources while protecting the integrity of the process. Additionally, the test strikes the proper balance between the parties. While the party that seeks relief must still identify the error and raise the issue before the appellate court, this test properly places the burden of proving harmless error on the beneficiary of the error. Requiring the beneficiary of the error to demonstrate that there is no reasonable possibility that the error contributed to the verdict discourages efforts to introduce error into the proceedings. "Equity and logic demand that the burden of proving such an error harmless must be placed on the

party who improperly introduced the evidence. [Placing] the burden of proof on the party against whom the evidence is used . . . would simply encourage the introduction of improper evidence." Gormley v. GTE Prod. Corp., 587 So. 2d 455, 459 (Fla. 1991).

The no reasonable possibility test also strikes the appropriate balance between the need for finality and the integrity of the judicial process. The test recognizes that not all errors have a reasonable possibility of contributing to the verdict, but the test affords relief on account of errors that do. Further, the application of the no reasonable possibility test for harmless error will foster consistency in appellate courts' analyses of harmless error. Having articulated the proper test for harmless error in civil appeals, we now apply the test to the facts of the present case.

**Evaluation of Harmless Error in this Case**

Special argues that the trial court committed harmful error when it excluded the proffered cross-examination of the defense AFE expert and when it excluded evidence related to two circumstances of alleged witness tampering. We discuss each of these arguments in turn. Consistent with the discussion that follows, we conclude that the exclusion of the cross-examination testimony and the exclusion of certain evidence of witness tampering were indeed harmful.

The cause of Susan's death was the key issue at trial. Baux and West Boca defended themselves against Special's allegations of negligence on the grounds that Susan died as the result of AFE. Special contested the AFE diagnosis and attempted to demonstrate that West Boca had a practice of over-diagnosing AFE. To that end, Special argues that the trial court erred when it precluded counsel from cross-examining Dr. Gary Dildy, the defense AFE expert, concerning whether West Boca was over-diagnosing AFE.

At trial, Dr. Dildy opined that Susan died of AFE. Dr. Dildy's diagnosis was a diagnosis of exclusion, at which he arrived after ruling out other possible causes of death. On cross-examination, Dr. Dildy testified that approximately one in 20,000 births results in AFE, but the occurrence of AFE can range from one in 8,000 to one in 80,000 births. Special sought to further cross-examine Dr. Dildy with a line of questioning that was intended to undermine the credibility of the testimony of those who diagnosed Susan as having died from AFE—including the testimony of Dr. Mark Adelman, the West Boca pulmonologist who diagnosed Susan with AFE after the emergency began. Dr. Adelman testified that the national average for AFE diagnoses can range from approximately one in 30,000 births to one in 80,000 births, but he estimated that during the then-eighteen-year existence of the obstetrics department at West Boca, there were 20,000 births and

one to two AFE diagnoses per year. Special introduced an interrogatory response from West Boca that showed that contrary to Dr. Adelman's estimate of 20,000 births per year, the average number of births per year at West Boca was about 2,200 births. Based on the national averages of AFE as testified to by Dr. Adelman and Dr. Dildy, Special sought to elicit an opinion from Dr. Dildy on whether AFE was being overdiagnosed at West Boca.

The defense objected to this line of questioning. After receiving argument from the parties, the trial court sustained the defense objection. However, the trial court allowed Special to proffer the cross-examination of Dr. Dildy. In relevant part, Special proffered the following:

> SPECIAL: Dr. Dildy, if, in fact, there are one to two amniotic fluid emboluses diagnosed . . . at West Boca Medical Center every year, and there are, in fact, 2,200 births per year . . . what does that tell you about West Boca Medical Center?

> DILDY: Well, under those assumptions, there's about one per thousand, that would be higher than the generally quoted rates in the literature. On the one hand, over a short period of time, it's certainly possible that things can occur in clusters. Over the long term, if there were strong data to suggest that amniotic fluid embolism were occurring at that rate over a period—over many years, then I would probably have to say that it's being overdiagnosed.

> SPECIAL: And, if, in fact, there's evidence that over a 17- to 18-year period, it's consistently one to two amniotic fluid emboluses per year, diagnosed by the critical care doctor, Dr. Adelman, and there are 2,200 births approximately per year, over that same period of time, do you believe the term "amniotic fluid embolism," at West Boca Medical Center, is being overused?

DILDY: If they were at that rate over a long period of time, I suspect there's many cases where you have presumed amniotic fluid embolism, but the pattern may not be—in fact, even in our study we had a number of presumed cases we excluded. . . . But, I would say certainly there's no question, there are cases of abnormal outcomes and disease states that are labeled as amniotic fluid embolism, where other people would argue it's not.

SPECIAL: If there is 1 in 2,000 births a year, that's approximately ten times what you told us is a fair national average, correct?

DILDY: Either ten times or five times, depending upon how you do the math, right?

SPECIAL: The math that you gave us was, that you believe is a reasonable number, that 1 in 20,000 patients have AFE, correct?

DILDY: That's one number I offered. It could be 1 in 8,000.

SPECIAL: It could be 1 in 80,000?

DILDY: It could be 1 in 80,000.

SPECIAL: So if there is one a year in West Boca Medical Center, that would be 1 in 2,000 as opposed to 1 in 20,000, that's ten times the national average.

DILDY: That would be a higher rate, correct.

SPECIAL: If it's 1 in 80,000, it would be 40 times the national average, right?

DILDY: Correct.

* * *

SPECIAL: . . . If there are two AFEs a year at West Boca Medical Center, and the national average is 1 in 80,000 say, okay, and

there's 2 per 2,000 at West Boca Medical Center, just doing the math, that would be 80 times the national average?

DILDY: Under those assumptions, right.

SPECIAL: Under those assumptions, what would that tell you about AFE and West Boca Medical Center?

DILDY: I would be very concerned that if this is actually a recorded incidence, as opposed to somebody's recollection. Because if you ask me, what's the incidence of this or that, I could give you a number which is going to be a pretty ballpark number. If that's a documented incidence, I would be concerned that the rate is probably inflated.

SPECIAL: And although you might be off here or there, you wouldn't be off by 40, 80 times the national average, would you, at your hospital?

DILDY: It just depends on how the question is asked. . . .

SPECIAL: If you're asked how many you diagnose a year and you say one to two, it shouldn't be off by 30, 40 times, should it?

DILDY: No, I would say in a place that does a little over 2,000 deliveries a year, you could easily have one or two a year per couple of years or here or there, but you wouldn't expect to have one or two per year long term, no. But this case here, we're talking about, it doesn't matter what all these other cases are, this case is this case, and this case is an amniotic fluid embolism.

Following the proffer, the trial court restated its ruling that Special would not be allowed to cross-examine Dr. Dildy on the issue of over-diagnosis. On appeal, although the district court concluded that the trial court should have allowed the excluded testimony, the court also determined that the exclusion of Dr. Dildy's testimony was harmless error under the "more likely than not" standard.

- 15 -

We agree with the district court that the trial court erred in excluding the testimony. The rules of evidence provided the trial court with no discretion to exclude the contested cross-examination. Section 90.403 of the Florida Statutes permits trial courts to exclude only evidence in which the "probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury, or needless presentation of cumulative evidence." § 90.403, Fla. Stat. (2007). Florida courts do not have the authority to bar or limit adverse or relevant evidence such as Special attempted to present here. Because the trial court erred when it excluded Dr. Dildy's testimony, we proceed to evaluate the error in light of the harmless error test we announce today. In doing so, we conclude that Baux and West Boca, as the beneficiaries of the error, have not demonstrated that there is no reasonable possibility that the exclusion of Dr. Dildy's testimony contributed to the verdict.

<u>Was the Exclusion of Dr. Dildy's Testimony Harmless Error?</u>

The essence of Special's argument on this issue is as follows: the jury should have been allowed to hear Dr. Dildy's opinion that if one to two out of 2,200 births each year at West Boca resulted in a diagnosis of AFE, West Boca was overdiagnosing AFE—thus drawing into question the credibility of the diagnosis of Susan. Special contends that the exclusion of this testimony was harmful error. We agree.

During the trial, Dr. Dildy reiterated his opinion that Susan died from AFE. Dr. Dildy also agreed that AFE was a diagnosis of exclusion, in other words, it is diagnosed only after other explanations are ruled out. As noted by the district court in this case, "[w]here the diagnosis is one of exclusion, the frequency with which one comes to that conclusion is a 'material fact' bearing upon the credibility of the diagnosis." Special, 79 So. 3d at 759 (footnote omitted). By precluding the jury from considering Dr. Dildy's testimony with regard to the over-diagnosis of AFE, Special was prevented from presenting evidence to demonstrate and further support the argument that physicians at West Boca were over-diagnosing AFE. The inability to address this issue through Dr. Dildy during cross-examination hindered Special's efforts to undermine the credibility and weight of Baux and West Boca's defense with regard to the cause of Susan's death as well as the credibility of Dr. Dildy, who held steadfast to the AFE diagnosis. See id. at 759-60 ("The cross-examination was also relevant to Dr. Dildy's direct examination where he testified to the incidence of AFE in births and its rarity." (emphasis supplied)).

We reject the Fourth District's conclusion that the error was harmless because the excluded testimony was cumulative. The Fourth District stated:

> This issue was presented to the jury through the testimony of Dr. Adelman and in part from Dr. Dildy. This evidence allowed the plaintiff's attorney in closing argument to hammer on the significance of the statistical abnormality.

- 17 -

Id. at 772. Because the battle of experts has become as much a part of a trial as the conflict that the litigation addresses, see Marsh v. Valyou, 977 So. 2d 543, 548 (Fla. 2007) (quoting Berry v. CSX Transp., Inc., 709 So. 2d 552, 571 (Fla. 1st DCA 1998)); Emory v. Fla. Freedom Newspapers, 687 So. 2d 846, 847 (Fla. 4th DCA 1997); Secada v. Weinstein, 563 So. 2d 172, 172 (Fla. 3d DCA 1990); Langston v. King, 410 So. 2d 179, 180 (Fla. 4th DCA 1982), Special's inability to critically address the issue of over-diagnosis with Dr. Dildy significantly handicapped his case. Also without merit is Baux and West Boca's allegation that if the trial court erred in excluding this testimony, the error was harmless because Special was able to discuss this issue during closing argument. The commentary of counsel in closing is not evidence, nor may the jury consider the mere argument as evidence when it deliberates and renders a verdict. See Braddy v. State, 111 So. 3d 810, 843 (Fla. 2012) ("The trial court properly instructed the jury that statements [offered] during closing argument did not constitute evidence to be considered in determining [the defendant's] guilt."), cert. denied, 134 S. Ct. 275 (2013). Barring an entire line of cross-examination of an expert witness concerning critical facts and opinions directly related to the core issue of a case necessitates recognition that the responses of the expert witness here would have yielded powerful impeachment evidence. Dr. Dildy's concession as to the inaccuracies and anomalies of Dr. Adelman's AFE diagnoses would have

- 18 -

reasonably had a significant effect on the jury's deliberations and decisions, particularly with regard to the cause of Susan's death.

Given the relevance and probative force of Dr. Dildy's testimony, the exclusion of this cross-examination was in fact harmful. The jury should have been permitted to hear testimony on this factual issue and to weigh it against the statements and credibility of the testifying experts. To the extent that Baux and West Boca allege that Dr. Adelman's numbers concerning the rate of AFE at the hospital were "grossly overestimated," and thus should not serve as a basis for Special's allegation of over-diagnosis, this was an issue for the jury to determine. There is more than a "reasonable possibility" that the trial court's erroneous evidentiary ruling contributed to the verdict, and accordingly, a new trial is required. See DiGuilio, 491 So. 2d at 1135. Having concluded that the exclusion of Dr. Dildy's testimony was harmful error, we now turn to the exclusion of evidence of alleged witness tampering.

### Witness Tampering

Special also argues that the trial court erred when it excluded evidence relating to the defense's alleged witness tampering of Dr. Barbara Wolf, the deputy chief medical examiner who performed the autopsy on Susan. Dr. Wolf concluded that the autopsy revealed no evidence of AFE and opined to a reasonable degree of medical certainty that Susan did not die of AFE. A part of the autopsy included

obtaining specimens that were used to create slides for microscopic examination in order to determine the presence of AFE.

According to Special, the defense attempted to intimidate Dr. Wolf because she did not agree that AFE was the cause of Susan's death. At trial, Dr. Wolf testified that while the majority of AFE-related deaths yield evidence of AFE in the autopsy, the autopsy of Susan revealed no evidence of AFE. Although the district court did not address this issue in its opinion, ". . . once this Court has jurisdiction of a cause, it has jurisdiction to consider all issues appropriately raised in the appellate process, as though the case had originally come to this Court on appeal." Savoie v. State, 422 So. 2d 308, 312 (Fla. 1982). Although "[t]his authority to consider issues other than those upon which jurisdiction is based is discretionary with this Court and should be exercised only when these other issues have been properly briefed and argued and are dispositive of the case," we do so here because of the serious nature of witness tampering allegations. Id.

Florida courts permit evidence of threats or witness intimidation if the threats are attributable to the opposing party. See Koon v. State, 513 So. 2d 1253, 1256 (Fla. 1987) ("It has been held that evidence of threats made against witnesses is inadmissible to prove guilt unless the threats are shown to be attributable to the defendant.") (citing Duke v. State, 142 So. 886 (Fla. 1932); Jones v. State, 385 So. 2d 1042 (Fla. 1st DCA 1980); Coleman v. State, 335 So. 2d 364 (Fla. 4th DCA

- 20 -

1976)); see also State v. Price, 491 So. 2d 536, 536-37 (Fla. 1986) ("A third person's attempt to influence a witness is inadmissible on the issue of the defendant's guilt unless the defendant has authorized the third party's action."); Manuel v. State, 524 So. 2d 734, 735 (Fla. 1st DCA 1988) (noting that testimony concerning witness intimidation is admissible "provided the attempt was with the authority, consent, or knowledge of the defendant").[2] It is admissible because it is "evidence of a consciousness of guilt," and there is nothing more sacred than judicial proceedings that are free from attempts to tamper with or intimidate witnesses. See Coronado v. State, 654 So. 2d 1267 (Fla. 2d DCA 1995). Indeed, without a judicial proceeding free of intimidation and threats, there is no reason for the fact-finding process. The decision to permit evidence of unscrupulous conduct, however, is tempered by those "circumstances where testimony concerning third-party threats may . . . be deemed so prejudicial as to require its exclusion" despite

---

2. In Lynch v. McGovern, 270 So. 2d 770, 772 (Fla. 4th DCA 1972) (quoting Wigmore on Evidence, Vol. 2 (3d ed.), section 278, at 120), the Fourth District stated:

> * * * it has always been understood—the inference, indeed, is one of the simplest in human experience—that a party's falsehood or other fraud in the preparation and presentation of his cause, his fabrication or suppression of evidence by bribery or spoliation, and all similar conduct, is receivable against him as an indication of his consciousness that his case is a weak or unfounded one; and from that consciousness may be inferred the fact itself of the cause's lack of truth and merit (emphasis added).

otherwise being admissible according to the evidentiary rules. See Koon, 513 So.

2d at 1256 (citing State v. Price, 491 So. 2d 536 (Fla. 1986)).

The trial court addressed the alleged intimidation as two separate issues:

(1) whether sufficient evidence was presented to introduce into evidence the fact

that a disciplinary proceeding had been filed against Dr. Wolf by the Florida

Department of Health (DOH); and (2) whether the defense attempted to intimidate

Dr. Wolf prior to her deposition. The trial court allowed Special to only proffer

Dr. Wolf's testimony on these issues. We evaluate each allegation in turn.

### Department of Health Complaint

After the initiation of the lawsuit against Dr. Baux, a DOH complaint was

initiated against him. To assist in the defense of Dr. Baux, his attorney, Eugene

Ciotoli, hired Dr. Stephen Factor as an expert. Dr. Factor reviewed the slides from

the autopsy, and contrary to Dr. Wolf's conclusion, determined that the slides

showed widespread proof of AFE.

The record reveals that subsequently, a Dr. Katims, at DOH, recommended

in a memorandum that

> we open a file on Barbara Wolf, M.D., the medical examiner who did
> the initial autopsy and specifically indicated that she found no
> evidence of amniotic fluid embolus. At the request of a defense
> attorney, another pathologist reviewed the tissue and apparently cut
> new sections and found evidence of widespread embolism from
> amniotic fluid. This is a serious error and we should open the file so
> that we may deal with it appropriately.

When DOH issued a formal complaint against Dr. Wolf, she hired counsel, William Pincus, to defend her.

Special sought to introduce evidence of the DOH complaint against Dr. Wolf as evidence of witness tampering. However, the trial court concluded that there was an insufficient link between the defense and the filing of the complaint. The trial court precluded testimony "with respect to the [DOH] investigation . . . [because] I don't believe there's a sufficient evidentiary nexus to allow us to go there [and address witness intimidation] at this point. [Dr. Wolf] doesn't know who filed [the complaint that led to the disciplinary proceeding], and we can surmise who may or may not have, but I don't think we have enough to go there." We agree.

Dr. Factor's observations were made during the course of his role in defending Dr. Baux's DOH matter, and it appears that the defense attorney request referenced in the memorandum from Dr. Katims was a request that Dr. Factor review the slides in order to assist in defending Dr. Baux—not a request that DOH issue a complaint against Dr. Wolf. The evidence in the record demonstrates that DOH initiated its investigation of Dr. Wolf in light of Dr. Factor's conclusions, not because of a specific request by the defense. Thus, we agree with the trial court's conclusion that there was an insufficient factual basis to attribute the DOH

complaint against Dr. Wolf to Baux or West Boca. Thus, this evidence was properly excluded.

## Statements to Dr. Wolf

Although we agree with the trial court's exclusion of evidence relating to the DOH complaint, we conclude that the trial court erred when it excluded evidence of witness tampering in the form of statements made to Dr. Wolf through her attorney. Special was precluded from introducing Dr. Wolf's testimony about the statements because the trial court concluded that while relevant, the evidence constituted double hearsay. As we explain, the jury was entitled to hear this evidence.

About three months after the filing of the DOH complaint against Dr. Wolf, Dr. Wolf was deposed by the defense. According to Dr. Wolf, just before the deposition, her lawyer (William Pincus) told her of statements from Dr. Baux's defense counsel (Eugene Ciotoli). Allegedly, Mr. Ciotoli suggested to Mr. Pincus that Dr. Wolf might not want to embarrass herself by maintaining that the autopsy showed no evidence of AFE and that a world-renowned AFE expert was going to contradict her opinion and testify that the slides on which she saw no evidence of AFE were actually replete with evidence of AFE. Dr. Wolf was handed photographs of the slides just before the deposition, which she reviewed, and ultimately determined that her opinion was the same, that there was no evidence of

AFE on the slides. At trial, Special proffered the following testimony from

Dr. Wolf:

> SPECIAL: Please tell us what you were told and by who?
>
> DR. WOLF: I was informed by Mr. Pinkus [sic] that, as he phrased it,
> I would not want to embarrass myself according to the defense
> attorney, by disagreeing with Dr. Factor, who was identified to me as
> the defense expert involved in the Board of Medicine complaint.
>
> SPECIAL: And—
>
> DR. WOLF: I'm sorry.
>
> SPECIAL: Go ahead.
>
> DR. WOLF: I was also given a note. Mr. Ciotoli gave my lawyer,
> who was also present, who then gave to me a notebook containing a
> number of photographs that were identified as being photographs
> taken by Dr. Factor of the slides in this case that allegedly
> demonstrated the presence of amniotic fluid.
>
> SPECIAL: All right. How, did you—the information that you got
> regarding not wanting to go up against Dr. Factor, was that
> information provided to you by your lawyer that he got from the
> defense lawyer, is that how you understood it?
>
> DR. WOLF: Yes, it was.

Dr. Wolf did not change her opinion that the autopsy did not reveal evidence of

AFE, nor her conclusion that Susan did not die of AFE. But, she stated during her

proffered testimony that she believed that the statements and related conduct were

an attempt to get her to change her testimony:

> SPECIAL: Okay. What did you think after you looked at the pictures,
> after you heard what you had been told first, that it was supposedly on

- 25 -

these slides, and then you looked at these pictures and it wasn't there. What did you think somebody was attempting to do to your testimony?

DR. WOLF: By being offered that, being shown these photographs immediately before my deposition, I assumed that an attempt was being made to change my mind.

SPECIAL: And you were not intimidated in that regard, were you?

DR. WOLF: Certainly not.

This relevant evidence was admissible. In Jost v. Ahmad, the Second District Court of Appeal addressed an allegation of witness tampering in a medical malpractice case. Jost, 730 So. 2d 708, 710 (Fla. 2d DCA 1998). The plaintiff's treating physician testified that the hospital's insurance carrier contacted the physician's risk management officer, and the carrier attempted to pass along information to the physician suggesting that he should remember that his "testimony was to limit collateral damage." Id. at 709-10. The trial court denied the plaintiff's request to question the physician about the communication before the jury. Id. at 710. The Second District held that the trial court reversibly erred by excluding the communication because attempts at witness intimidation are " 'fundamentally unfair and pervert the truth-seeking function.' " Id. at 711 (quoting McCool v. Gehret, 657 A.2d 269 (Del. 1995)). The district court explained that to determine whether the communication should be admitted, the "threshold question [wa]s whether the matter is relevant," which "turns on the

- 26 -

meaning of the communication as it could be reasonably understood by [the targeted witness]." Id. at 710. With this question in mind, the Second District concluded that the excluded testimony should have been admitted as both impeachment and substantive evidence. See id. at 711.

Evidence of this nature "need not lead inescapably towards a single conclusion to be relevant, it need only make certain facts more probable than not." McQueeney v. Wilmington Trust Co., 779 F.2d 916, 921 (3d Cir. 1985). In this case, it is more probable than not that a third party with the "authority, consent, or knowledge" of Baux, if not West Boca as well, attempted to influence Dr. Wolf and alter her testimony. See Manuel, 524 So. 2d at 735 (citing Price, 491 So. 2d 536). Neither Baux nor West Boca has provided this Court with a reason to conclude that some other person or party would have had a motive to harass Dr. Wolf as occurred here, and it is unlikely that some other person or party would have been privy to and interested in Dr. Wolf's conclusions regarding the cause of Susan's death. The circumstances strongly suggest that the defense or someone working on behalf of the defense was responsible for the events that occurred prior to Dr. Wolf's deposition, and that party intended to and did exert pressure on Dr. Wolf in an effort to change her opinion.

Special satisfied the requirements in Jost that the challenged testimony must be relevant and the communication reasonably understood by the targeted witness

as an attempt to intimidate.  First, in its order, the trial court properly found Dr. Wolf's testimony to be relevant.  This testimony concerned the key issue in this case—the cause of Susan's death.  Second, although Dr. Wolf may not have changed her testimony nor been intimidated, she understood the intent of the events preceding her deposition to be an effort to alter her conclusion.

Moreover, because the intimidating parties were acting as agents of Baux, the trial court's hearsay concerns are eliminated.  Compare Jost, 730 So. 2d at 710 (permitting admission of communications to the targeted doctor from the defendant's insurance carrier, which is "akin to a communication from [the defendant] . . . [and not akin to] a communications from a third party with no direct interest in the outcome of the case."), with Nagel v. State, 774 So. 2d 835, 838 (Fla. 4th DCA 2000) (ruling that a police officer's testimony was inadmissible because the state did not present evidence that the contested telephone call "was made with appellant's authority, consent, or knowledge").  The trial court's failure to admit testimony on this issue amounted to an abuse of discretion, and in light of the harmful error caused by the exclusion of this evidence, a new trial is required.

**CONCLUSION**

For the foregoing reasons, in a civil appeal, the test for harmless error requires the beneficiary of the error to prove that the error complained of did not contribute to the verdict.  Alternatively stated, the beneficiary of the error must

prove that there is no reasonable possibility that the error complained of contributed to the verdict. We reverse the district court's decision and remand for proceedings consistent with this opinion.

It is so ordered.

QUINCE and PERRY, JJ., concur.
PARIENTE, J., concurs in part and dissents in part with an opinion.
LEWIS, J., specially concurs in part and dissents in part with an opinion.
POLSTON, J., dissents with an opinion in which CANADY, J., concurs.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

PARIENTE, J., concurring in part and dissenting in part.

I join the majority in concluding that a new trial is warranted based on the erroneous and harmful exclusion of testimony regarding the overdiagnosis of amniotic fluid embolus (AFE) that the plaintiff sought to elicit during the cross-examination of the defense's expert witness. I dissent, however, from the majority's decision to adopt the same harmless error standard for civil cases as is used in criminal cases, despite the different burdens of proof and constitutional interests that are implicated in the civil and criminal contexts. I also disagree with the majority's conclusion that the trial court erred in excluding evidence related to the alleged witness tampering of the deputy medical examiner.

My primary disagreement is with the majority's decision to adopt the criminal "no reasonable possibility" test for harmless error, which is grounded in

the "beyond a reasonable doubt" standard of proof that applies in criminal trials. Because a different standard applies in civil cases, and because the attributes of the two types of cases are very different, I would adopt the "more likely than not" standard set forth by the Fourth District Court of Appeal and require the beneficiary of the error in a civil case to show that it is more likely than not that the error did not influence the trier of fact and thereby contribute to the verdict.

I begin by discussing my view concerning the appropriate standard for harmless error in civil cases and then proceed to address each of the specific instances of alleged error in turn.

## I. Harmless Error Standard in Civil Cases

While I disagree with the ultimate standard adopted by the majority, I do agree with both the majority and the Fourth District in rejecting the outcome-determinative "but for" test for determining harmless error in civil cases in favor of an "effect on the trier-of-fact" approach, as embodied in the harmless error approach this Court adopted in State v. DiGuilio, 491 So. 2d 1129, 1135 (Fla. 1986). See majority op. at 8-9; Special v. Baux, 79 So. 3d 755, 770-71 (Fla. 4th DCA 2011). As this Court explained in DiGuilio, "harmless error analysis must not become a device whereby the appellate court substitutes itself for the jury." DiGuilio, 491 So. 2d at 1136. Further, placing the burden of proof on the

beneficiary of the error, as the majority properly does, is consistent with our own

precedent in civil cases:

> Equity and logic demand that the burden of proving such an error
> harmless must be placed on the party who improperly introduced the
> evidence. Putting the burden of proof on the party against whom the
> evidence is used, as the district court did, would simply encourage the
> introduction of improper evidence. The record in this case shows that
> the issue of liability was close. We cannot say that the jury's verdict
> on liability was not improperly influenced by the evidence of the
> Gormleys' insurance claim. The likelihood of improper influence on
> the liability issue was not rebutted by the one who introduced the
> evidence.

Gormley v. GTE Prods. Corp., 587 So. 2d 455, 459 (Fla. 1991); see also Sheffield

v. Superior Ins. Co., 800 So. 2d 197, 203 (Fla. 2001) ("The burden of proving that

the admission of the collateral source evidence was harmless rests on [the

beneficiary of the collateral source evidence].").

However, because of the differing burdens of proof and constitutional rights

at stake, I disagree with the majority's adoption of the identical standard for

harmless error in civil cases as applies in criminal cases. By adopting the test for

harmless error that applies to criminal cases without even referencing the different

burdens and interests that apply in the civil context, the majority favors form over

substance and offers no compelling explanation as to why the "no reasonable

possibility" language from DiGuilio, which is rooted in the "beyond a reasonable

doubt" burden of proof, should be used in civil cases. As stated by the Fourth

District, the harmless error test for civil cases "should acknowledge the particular attributes of those cases." Special, 79 So. 3d at 770.

Indeed, the most obvious attribute of civil cases that distinguishes them from their criminal counterparts is the "preponderance of the evidence" burden of proof that applies instead of the "beyond a reasonable doubt" standard that is the hallmark of criminal prosecutions. Although the harmless error test articulated by this Court in DiGuilio is based on the "beyond a reasonable doubt" standard that applies in the criminal context, DiGuilio, 491 So. 2d at 1138, the majority omits any discussion of the completely different "preponderance of the evidence" standard that applies in the civil context—despite adopting the identical harmless error test.

Specifically, instead of acknowledging this important difference, the majority simply transplants the "no reasonable possibility" language from the criminal harmless error test into the civil test it adopts, while eliminating the "beyond a reasonable doubt" portion of the test articulated in DiGuilio. Although unstated, the majority would presumably substitute the phrase "more likely than not" in place of "beyond a reasonable doubt," and thus the test would require the beneficiary of the error to prove "more likely than not" that the error did not contribute to the verdict, or alternatively stated, that there is "no reasonable

- 32 -

possibility" that the error contributed to the verdict. Because this test does not account for the different burdens of proof, it simply makes no sense.

While it is of course true that trial level burdens of proof and appellate standards of legal error are different concepts, I respectfully disagree with Justice Lewis's assertion in his separate opinion that "[t]he level of a factual burden of proof at trial has nothing to do with the standards for appellate legal error." Specially concurring in part & dissenting in part op. at 48 (Lewis, J.). As the majority itself makes clear, the harmless error test seeks to determine the effect a particular error had on the trier of fact and is not a device for an appellate court to improperly substitute its judgment for that of the jury. See majority op. at 8 ("Harmless error is not a device for the appellate court to substitute itself for the trier-of-fact by simply weighing the evidence." (quoting DiGuilio, 491 So. 2d at 1139)). In other words, the harmless error test asks the appellate court to put itself in the shoes of the jury and analyze how the error affected the jury, taking into consideration the permissible evidence upon which the jury could have legitimately relied and the impermissible evidence that may have influenced the jury's verdict.

In my view, the only way to properly assess how an error would have affected the jury is to apply an appellate standard that accounts for the burden of proof the jury was required to apply at trial. Such an approach does not

- 33 -

"commingle[] and confuse[]" trial level burdens with appellate standards. Specially concurring in part & dissenting in part op. at 48 (Lewis, J.). Instead, it appropriately acknowledges the proper role of an appellate court performing a harmless error test and recognizes that assessing the impact of an error on the jury—as the majority itself concludes to be the correct approach—requires the test applied by the appellate court to account for the burden applied by the jury.

Section 59.041, Florida Statutes (2003), provides that a court may not set aside a judgment or grant a new trial in any case, whether civil or criminal, unless "the error complained of has resulted in a miscarriage of justice." As the majority appropriately recognizes, "[u]nder this rule, appellate courts must evaluate harmless error on a case-by-case basis" and determine what constitutes a "miscarriage of justice" based on the record and factors present in each particular case. Majority op. at 6.

In his separate opinion, Justice Lewis suggests that the Legislature's use of the same "miscarriage of justice" language for both criminal and civil cases "specifically and unambiguously" indicates that the Legislature intended the same harmless error test to apply in both contexts. Specially concurring in part & dissenting in part op. at 48 (Lewis, J.). However, it is the test this Court adopted in DiGuilio that gives meaning to the phrase "miscarriage of justice" in criminal cases—while respecting the Legislature's authority to enact harmless error

- 34 -

statutes—and that sets forth a framework for applying the standard on a case-by-case basis. In fact, this point was recognized by the Fourth District, which explained that "the trigger for reversible error is the occurrence of a 'miscarriage of justice'; how the courts have defined this term has determined the scope of the statute's application." Special, 79 So. 3d at 761.

Any analysis that is specific to each case must account for the particular attributes and distinctive features of that case. In other words, while "miscarriage of justice" is the standard that the Legislature has chosen to apply to all cases, what constitutes a "miscarriage of justice" in one case is not the same as what constitutes a "miscarriage of justice" in another. It is up to the judiciary to develop a framework for assessing and analyzing this determination in individual cases. If the statute clearly and unambiguously set forth the specific test for courts to apply to determine whether an error is harmless in an individual case, courts would not have struggled for more than a century to interpret the statute, and this Court would not now be called upon to provide a framework for analyzing what constitutes a "miscarriage of justice" in civil cases.

Instead of adopting the identical test for the sake of consistency between cases that arise in contexts that are completely different, I would adopt the well-reasoned opinion of the Fourth District as to the appropriate standard for harmless error in civil cases. Sitting en banc, the Fourth District cogently articulated why

- 35 -

the proper test should require the beneficiary of the error to prove "more likely than not that the error did not influence the trier of fact and thereby contribute to the verdict." Special, 79 So. 3d at 771.

In my view, the Fourth District persuasively explained why a different standard for reversal is well-suited to civil cases:

> In formulating a harmless error test in civil cases, it is important to recognize that DiGuilio derived its formulation from the elevated burden of proof in criminal cases:
>
> > The harmless error test . . . places the burden on the state, as the beneficiary of the error, to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict or, alternatively stated, that there is no reasonable possibility that the error contributed to the conviction.
>
> DiGuilio, 491 So. 2d at 1135 (emphasis added) (citation omitted). This elevated test acknowledges (1) the higher burden of proof in criminal cases, which amplifies the potential effect of an evidentiary error on the trier of fact, and (2) the special concern for the legitimacy of criminal convictions expressed in the constitutional and statutory protections accorded to criminal defendants. A harmless error test for civil cases should acknowledge the particular attributes of those cases.

Id. at 770. In other words, as DiGuilio makes clear, the "no reasonable possibility" language in the criminal harmless error test cannot be divorced from the "beyond a reasonable doubt" language, since the two phrases are simply alternative formulations of the same test, which is rooted in the "particular attributes" of criminal prosecutions. See Chapman v. California, 386 U.S. 18, 24 (1967) ("There is little, if any, difference between our statement in [a prior case] about 'whether

there is a reasonable possibility that the evidence complained of might have contributed to the conviction' and requiring the beneficiary of a constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained."); see also Black's Law Dictionary 1457 (10th ed. 2009) (defining "reasonable doubt" as "the belief that there is a real possibility that a defendant is not guilty").

When the Court is required to address harmless error in criminal cases, it is always the State that has obtained a conviction against a defendant based in some measure on an erroneous legal ruling at trial. Therefore, the strictest formulation of the harmless error test, as set forth in DiGuilio, is consistent with the State's responsibility to ensure that convictions are secured without the assistance of harmful errors, which is an important public policy concern. See DiGuilio, 491 So. 2d at 1138-39.

By contrast, an error in a civil case could result in potential harm to either a plaintiff or a defendant. Thus, the use of the same standard for harmless error as applies to the burden of proof in civil cases—that a particular occurrence was "more likely than not"—vindicates the concerns that the majority refers to as "conserv[ing] judicial resources while protecting the integrity of the process." Majority op. at 10. It also "strikes the proper balance between the parties." Id. In fact, a harmless error test based on the "preponderance of the evidence" standard

actually strikes a <u>better</u> and more appropriate balance because it takes into account

how each of the parties in a civil case may be affected by an erroneous legal ruling.

As stated by the Ninth Circuit Court of Appeals regarding why that circuit

applies a different harmless error standard for civil and criminal cases:

> The purpose of a harmless error standard is to enable an appellate court to gauge the probability that the trier of fact was affected by the error. <u>Perhaps the most important factor to consider in fashioning such a standard is the nature of the particular fact-finding process to which the standard is to be applied. Accordingly, a crucial first step in determining how we should gauge the probability that an error was harmless is recognizing the distinction between civil and criminal trials.</u> This distinction has two facets, each of which reflects the differing burdens of proof in civil and criminal cases. First, the lower burden of proof in civil cases implies a larger margin of error. The danger of the harmless error doctrine is that an appellate court may usurp the jury's function, by merely deleting improper evidence from the record and assessing the sufficiency of the evidence to support the verdict below. This danger has less practical importance where, as in most civil cases, the jury verdict merely rests on a more probable than not standard of proof.
>
> The second facet of the distinction between errors in civil and criminal trials involves the differing degrees of certainty owed to civil and criminal litigants. Whereas a criminal defendant must be found guilty beyond a reasonable doubt, a civil litigant merely has a right to a jury verdict that more probably than not corresponds to the truth.
>
> The civil litigant's lessened entitlement to veracity continues when the litigant becomes an appellant. We conclude that <u>a proper harmless error standard for civil cases should reflect the burden of proof. Just as the verdict in a civil case need only be more probably than not true, so an error in a civil trial need only be more probably than not harmless.</u> In other words, when an appellate court ponders the probable effect of an error on a civil trial, it need only find that the jury's verdict is more probably than not untainted by the error.

Haddad v. Lockheed Cal. Corp., 720 F.2d 1454, 1458-59 (9th Cir. 1983) (emphasis added) (citations omitted). The Tenth Circuit Court of Appeals has also aptly explained why "absent some countervailing policy . . . the harmless error standard should mirror the standard applied at trial," since logic requires the stringency of the test for judging error on appeal to be the same as the stringency of the standard applied at trial. U.S. Indus., Inc. v. Touche Ross & Co., 854 F.2d 1223, 1252 n.39 (10th Cir. 1988).

Although Justice Lewis in his separate opinion relies on McQueeney v. Wilmington Trust Co., 779 F.2d 916 (3d Cir. 1985), for the proposition that the same standard should apply in both contexts, the Third Circuit Court of Appeals has adopted "a moderately stringent, though not unreasonably high, standard in civil as well as criminal cases"—unlike the most stringent test for harmless error that this Court adopted in DiGuilio for criminal cases. Id. at 927; see also Gov't of Virgin Islands v. Toto, 529 F.2d 278, 284 (3d Cir. 1976) (explaining that the Third Circuit follows the "middle ground" or "highly probable" test for harmless error). The harmless error test adopted by the Third Circuit is simply not the standard in Florida, and the considerations identified by the Third Circuit as a basis for applying the same test are therefore less persuasive. See Roger J. Traynor, The Riddle of Harmless Error 35 (1970) (explaining that an appellate court has three options in choosing a harmless error standard: (1) more probable than not; (2)

highly probable; or (3) almost certain); <u>McQueeney</u>, 779 F.2d at 924 (stating that "beyond a reasonable doubt" is "a more stringent standard than 'high probability,' " as followed in the Third Circuit).

The Third Circuit has stated, as a basis for adopting the same test for harmless error in civil and criminal cases, that "broad institutional concerns militate against increasing the number of errors deemed harmless." <u>McQueeney</u>, 779 F.2d at 927. This Court, however, already follows that policy in applying the most stringent of possible harmless error standards for criminal cases, where the defendant's constitutional liberty interest is always at stake. Unlike in Florida, the Third Circuit's test for harmless error in the criminal context is not based on the "beyond a reasonable doubt" standard. To apply a lower standard for civil cases than an already less stringent standard that applies to criminal cases would lead to the kind of potential for an increased number of errors that is simply not an issue in Florida.

For all these reasons, I would adopt the Fourth District's cogent articulation of the proper test for harmless error in civil cases. Under this approach,

> harmless error occurs in a civil case when it is more likely than not that the error did not contribute to the judgment. To avoid a new trial, the beneficiary of the error in the trial court must show on appeal that it is more likely than not that the error did not influence the trier of fact and thereby contribute to the verdict.

<u>Special</u>, 79 So. 3d at 771.

## II. The Alleged Errors

Having set forth what I believe to be the appropriate test for harmless error in civil cases, I now address the two specific instances of alleged error in this case. In short, I agree with the majority's conclusion as to the first, but disagree as to the second.

### A. Exclusion of Cross-Examination Concerning AFE

Although I disagree with this Court's adoption of the same test for harmless error in civil cases as the Court applies in criminal cases, I agree with the majority that the error in restricting the cross-examination of the defense expert regarding the overdiagnosis of AFE was not harmless error, regardless of which standard is applied. Because the focus of the entire case revolved around whether Susan Special's death was caused by medical malpractice or AFE, the limitation on the cross-examination and the acknowledgment by the defense's own expert concerning the possibility of overdiagnosis of AFE cannot be said to amount to harmless error. That is, Baux and West Boca have not demonstrated that it is more likely than not that the exclusion of this testimony did not contribute to the jury's verdict finding the defendants not liable. This testimony directly called into question the credibility of the AFE diagnosis in this case, particularly because AFE is a diagnosis of exclusion, and unduly restricted Special's ability to undermine the defense expert's testimony in the minds of the jurors.

Further, I agree that the ability of trial counsel to argue about overdiagnosis in closing is not a substitute for having the defense's own expert acknowledge the overdiagnosis of AFE, where the competing expert opinions were the focal point of this medical malpractice case. See Linn v. Fossum, 946 So. 2d 1032, 1041 (Fla. 2006) ("We conclude that the trial court erred in allowing Dr. Weaver-Osterholtz to testify that she consulted with colleagues and that this error was not harmless because the competing expert opinions on the proper standard of care were the focal point of this medical malpractice trial."); see also Donshik v. Sherman, 861 So. 2d 53, 56 (Fla. 3d DCA 2003) ("Where, as here, the competing expert opinions, on both sides, were the focal point of the trial, we cannot deem the error in the introduction of the ACAS report to be harmless.").

Accordingly, because the trial court's error in restricting the cross-examination of the defense expert was not harmless, a new trial is warranted.

## B. Exclusion of Testimony Concerning Alleged Witness Tampering

Lastly, based on the record before the trial court, I disagree with the majority that there was any error in disallowing testimony of the deputy medical examiner, Dr. Barbara Wolf, on what the plaintiff alleged to be "witness tampering." I deplore, as does this Court, any threats or attempts at intimidation attributable to the adverse party. The key, however, is that the proper predicate must be laid to show that it was the adverse party or its agent that made the threats or attempted to

intimidate a witness. To allow a party to argue witness intimidation where there is insufficient evidence demonstrating that this is what occurred is incredibly prejudicial to the party being accused of the improper conduct. See Penalver v. State, 926 So. 2d 1118, 1129-30 (Fla. 2006). The majority, in fact, recognizes this critical point in correctly concluding that there was an insufficient factual basis to attribute the Department of Health complaint against Dr. Wolf to the defendants and that this evidence was therefore properly excluded.

However, as to the pre-deposition comments allegedly made to Dr. Wolf by her attorney, neither Dr. Wolf's attorney nor Baux's defense attorney, the original declarant, testified as to what was said. Therefore, as the trial court properly recognized, the double hearsay issue with these alleged statements presents a threshold problem for their admission.

Moreover, simply being provided with photographs of slides taken by another expert, Dr. Factor, does not, in itself, amount to witness intimidation. There would have been nothing wrong with the plaintiff asking Dr. Wolf at trial if her attorney showed her photographs of slides taken by Dr. Factor before her deposition and whether that changed her opinion regarding her conclusion about the cause of death. That is a far cry, though, from allowing the plaintiff to argue to the jury that agents of the defense attempted to intimidate the witness and that those actions are evidence of their culpability.

It may be that in a new trial, a more specific nexus can be established with the defendants' alleged actions to pressure Dr. Wolf to change her testimony, including testimony from either of the two attorneys who engaged in the alleged conversation. The current record, however, is devoid of anything but hearsay and attenuated connections, with speculation having to fill the missing pieces. While I do not object to the further development of facts on this issue on remand, I would affirm the trial court's decision to exclude the evidence based on the facts as presented.

### III. Conclusion

In sum, I concur in the majority's conclusion that a new trial is warranted based on the trial court's error, which was not harmless, in excluding cross-examination testimony from the defense expert concerning the overdiagnosis of AFE. I dissent, however, from the majority's adoption of the identical standard for harmless error in civil cases as applies in the criminal context. This decision, in my view, fails to account for the important differences that exist between civil and criminal trials.

LEWIS, J., specially concurring in part and dissenting in part.

I concur with the well-reasoned and intellectually direct majority opinion as it accepts and adopts the standard for review that the beneficiary of the error must establish that there is no reasonable possibility that the error contributed to the

verdict to uphold application of harmless error. I also concur with the common sense and logical majority opinion and conclude that the failure of the trial court to permit the jury to hear testimony from Dr. Dildy concerning the extremely high rate of amniotic fluid embolus (AFE) diagnoses at West Boca constitutes harmful error that merits a new trial. I write separately only because I believe that additional justifications not mentioned by the majority explain why the harmless error test adopted today is appropriate in all civil appeals. Further, contrary to the majority in one limited area, I would permit the full exploration and further development of <u>both</u> allegations of witness intimidation in connection with the new trial proceedings.

## The Harmless Error Standard

I agree with the majority's conclusion that the "no reasonable possibility" harmless error standard preserves judicial resources, protects the integrity of the judicial process, and strikes the appropriate balance between parties. Equity and logic demand that the burden of proving an error to be harmless must be placed on the party who improperly introduced the evidence. Placing the burden on the party that introduced the error serves not only to penalize the offending party, but also discourages future efforts to introduce error into proceedings. If we were to place the burden of proof on the party against whom the evidence is used, we would simply encourage the introduction of improper evidence. <u>Gormley v. GTE Prod.</u>

- 45 -

Corp., 587 So. 2d 455, 459 (Fla. 1991); see also Sheffield v. Superior Ins. Co., 800 So. 2d 197, 203 (Fla. 2001) ("[W]hen a trial lawyer leads a judge into an obvious error . . . cries of harmless error on appeal are likely to fall on deaf ears.") (quoting Mattek v. White, 695 So. 2d 942, 944 (Fla. 4th DCA 1997)).

However, I also believe that DiGuilio's pervasiveness in harmless error assessments underscores why this Court should not depart from it by adopting a different standard for civil proceedings. See State v. DiGuilio, 491 So. 2d 1129, 1135 (Fla. 1986). Developing a different standard would only foster inconsistency and confusion in Florida law. See McQueeney v. Wilmington Trust Co., 779 F.2d 916, 927 (3d Cir. 1985) (discussing the varying standards of review in civil cases, and why creating a different test for harmless error in the civil versus criminal context would only add unnecessary confusion and complication for the courts). Furthermore, by applying the DiGuilio test in the civil context, we signal to litigating parties that our courts will not review allegations of error lightly, nor perpetuate such errors by affording them less scrutiny than the "reasonable possibility of affecting the verdict" standard provides. Further, by applying the DiGuilio test, we endorse a public policy that discourages any increase in the number of errors that our courts deems harmless. See McQueeney, 779 F.2d at 927 ("[B]road institutional concerns militate against increasing the number of errors deemed harmless.").

In DiGuilio, we addressed the relevant statutory authority, and explained

why section 924.33, Florida Statutes (1981), applied as opposed to section 59.041.

See 491 So. 2d at 1133-34.  Section 924.33 provides:

> No judgment shall be reversed unless the appellate court is of the
> opinion, after an examination of all the appeal papers, that error was
> committed that injuriously affected the substantial rights of the
> appellant.  It shall not be presumed that error injuriously affected the
> substantial rights of the appellant.

This section is part of chapter 924, which is titled "Criminal Appeals and

Collateral Review."  § 924.33, Fla. Stat. (2003).  The DiGuilio Court stated that

section 924.33 applied because that statute: (1) applies to all judgments regardless

of the type of error involved; and (2) explicitly provides that there shall be no

presumption that errors are reversible unless it can be shown that they are harmful.

See 491 So. 2d at 1133-34.  Although section 59.041 did not apply in DiGuilio, the

differences between this section and section 924.33 are not such as to render

DiGuilio's analysis inapposite.  Section 59.041 provides:

> No judgment shall be set aside or reversed, or new trial granted by any
> court of the state in any cause, civil or criminal, on the ground of
> misdirection of the jury or the improper admission or rejection of
> evidence or for error as to any matter of pleading or procedure, unless
> in the opinion of the court to which application is made, after an
> examination of the entire case it shall appear that the error complained
> of has resulted in a miscarriage of justice.  This section shall be
> liberally construed.

§ 59.041, Fla. Stat. (2003) (emphasis supplied).  The plain language of this section demonstrates that the Legislature has specifically and unambiguously elected <u>not</u> to apply a different harmless error standard in criminal and civil cases.[3]

Justice Pariente, in her concurring in part and dissenting in part opinion, criticizes the majority for "favoring form over substance" and adopting a harmless error standard in civil cases that is inconsistent with the clear legislative directive articulated in section 59.041.  She claims that the majority has ignored critical factors, such as the differing burdens of proof and other "particular attributes" that distinguish civil from criminal cases, and contends that the <u>DiGuilio</u> standard is inapplicable in civil cases.  Justice Pariente simply comingles and confuses trial level burdens of proof and trial level "particular attributes" with appellate standards of legal error.  The level of a factual burden of proof during trial has nothing to do with the standards for appellate legal error.  In criticizing the majority's analysis, Justice Pariente has also neglected to consider the deference this Court has traditionally afforded the Legislature for policy decisions that have been made regarding the harmless error standard.  In fact, we specifically

---

3. Section 90.104, Florida Statutes (2009), is also applicable to the instant case.  It addresses rulings on evidence and provides that

> (1) A court may predicate error, set aside or reverse a judgment, or grant a new trial on the basis of admitted or excluded evidence when a substantial right of the party is adversely affected . . . [and the issue is preserved].

recognized in <u>DiGuilio</u> that the "authority of the legislature to enact harmless error statutes is unquestioned." 491 So. 2d at 1134.

Here, the Legislature has established through section 59.041 the public policy that appellate courts shall not reverse trial court judgments "in any cause, civil or criminal," unless the error complained of has resulted in a miscarriage of justice. It certainly cannot be disputed that the Legislature was unaware when it made this policy decision that the trial level burden of proof differs in civil and criminal cases, or that other "particular attributes" differentiate the two types of cases. However, because Justice Pariente considers the Legislature's policy determinations to be inconsistent with her view, she basically ignores them altogether. Justice Pariente relies upon the "particular attributes" approach to conclude that the "more likely than not" standard developed by the Fourth District is appropriate in all civil cases. This approach, however, not only disregards our holding in <u>DiGuilio</u> that recognized the Legislature retains broad authority to regulate the application of harmless error statutes, but also completely ignores the plain language of section 59.041. In so doing, Justice Pariente has essentially concluded that section 59.041 is irrelevant and should not impact the determination of the appellate standard for legal error that should apply in civil cases. While Justice Pariente and other lower court judges may not agree with the statutes, it is inappropriate for them to suggest that their personal views of the applicable

harmless error standard should trump the standard contained in the statutory structure. Justice Pariente advances a dual standard for civil and criminal cases contrary to the single standard established in the Florida Statutes.

## Additional Harmful Error

I disagree only with the majority's determination that the trial court did not err when it precluded Special from further exploring and presenting evidence that strongly suggested that Baux and West Boca attempted to intimidate the key fact witness, medical examiner Dr. Wolf, regarding the Department of Health (DOH) complaint. The decision to preclude Dr. Wolf's testimony on this important subject amounted to an abuse of discretion and was not harmless error. With a remand for a new trial, I would permit further exploration and development of material facts on this issue.

## Standard of Review

A trial court's decision to admit evidence is reviewed under the abuse of discretion standard. See Braddy v. State, 111 So. 3d 810, 858 (Fla. 2012), cert. denied, 134 S. Ct. 275 (2013); Simmons v. State, 934 So. 2d 1100, 1116 (Fla. 2006) ("A trial court has wide discretion concerning the admissibility of evidence and the range of subjects about which an expert can testify."). A court's discretion, however, is circumscribed by the rules of evidence, see Johnston v. State, 863 So. 2d 271, 278 (Fla. 2003), and a ruling on the admissibility of evidence will

constitute an abuse of discretion if it is based "on an erroneous view of the law or on a clearly erroneous assessment of the evidence." Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 405 (1990); Johnson v. State, 969 So. 2d 938, 949 (Fla. 2007).

Here, the precluded testimony concerned whether there had been an extra-judicial attempt to intimidate and discredit Dr. Wolf, the medical examiner, because she disagreed as to the cause of Susan's death—the dispositive issue in this case. Dr. Wolf, as the governmental expert charged with investigating deaths, expressed the opinion that Susan did not die from AFE. Because there is a very real and reasonable view that the failure to admit testimony on this issue also contributed to the verdict, I disagree with the majority's conclusion that the decision to preclude evidence on this testimony was harmless and not an abuse of discretion.

**Analysis**

Florida courts permit evidence of threats or witness intimidation if the threats are attributable to the opposing party. See Koon v. State, 513 So. 2d 1253, 1256 (Fla. 1987) ("It has been held that evidence of threats made against witnesses is inadmissible to prove guilt unless the threats are shown to be attributable to the defendant." (citing Duke v. State, 142 So. 886 (Fla. 1932); Jones v. State, 385 So. 2d 1042 (Fla. 1st DCA 1980); Coleman v. State, 335 So. 2d 364 (Fla. 4th DCA

1976))); see also State v. Price, 491 So. 2d 536, 536-37 (Fla. 1986) ("A third person's attempt to influence a witness is inadmissible on the issue of the defendant's guilt unless the defendant has authorized the third party's action."); Manuel v. State, 524 So. 2d 734, 735 (Fla. 1st DCA 1988) (noting that testimony concerning witness intimidation is admissible, "provided the attempt was with the authority, consent, or knowledge of the defendant").[4]  It is admissible because it is "evidence of a consciousness of guilt," see Coronado v. State, 654 So. 2d 1267, 1269 (Fla. 2d DCA 1995),[5] and there is nothing more sacred than judicial

---

4.  In Lynch v. McGovern, 270 So. 2d 770, 772 (Fla. 4th DCA 1972) (quoting Wigmore on Evidence, Vol. 2 (3d ed.), section 278, at 120), the Fourth District stated:

> * * * it has always been understood—the inference, indeed, is one of the simplest in human experience—that a party's falsehood or other fraud in the preparation and presentation of his cause, his fabrication or suppression of evidence by bribery or spoliation, and all similar conduct, is receivable against him as an indication of his consciousness that his case is a weak or unfounded one; and from that consciousness may be inferred the fact itself of the cause's lack of truth and merit (emphasis added).

5.  See also Edward W. Cleary, McCormick on Evidence, § 273, at 660 (2d ed. 1972) (footnotes omitted):

> [W]rongdoing by the party in connection with his case, amounting to an obstruction of justice[,] is also commonly regarded as an admission by conduct.  By resorting to wrongful devices he is said to give ground for believing that he thinks his case is weak and not to be won by fair means.  Accordingly, a party's false statement about the matter in litigation, whether before suit or on the stand, his fabrication of false documents, his undue pressure, by bribery or intimidation or

proceedings that are free from attempts to tamper with or intimidate witnesses. Indeed, without a judicial proceeding free of intimidation and threats, there is no reason for the fact-finding process. The decision to permit evidence of unscrupulous conduct, however, is tempered by those "circumstances where testimony concerning third-party threats may . . . be deemed so prejudicial as to require its exclusion" despite otherwise being admissible according to the evidentiary rules. See Koon, 513 So. 2d at 1256 (citing Price, 491 So. 2d at 536).

In Jost v. Ahmad, the Second District Court of Appeal addressed an allegation of witness tampering in a medical malpractice case. 730 So. 2d 708, 710 (Fla. 2d DCA 1999). The plaintiff's treating physician testified that the hospital's insurance carrier contacted the physician's risk management officer, and the carrier attempted to pass along information to the physician suggesting that he should remember that his "testimony was to limit collateral damage." Id. at 709-10. The trial court denied the plaintiff's request to question the physician about the communication before the jury. Id. at 710. The Second District held that the trial court reversibly erred by excluding the communication because attempts at witness intimidation are "fundamentally unfair and pervert the truth-seeking function." Id. at 711 (quoting McCool v. Gehret, 657 A.2d 269, 276 (Del. 1995)). The same rule

other means, to influence a witness to testify for him . . . all these are instances of this type of admission by conduct.

applies here. The district court explained that to determine whether the communication should be admitted, the "threshold question [wa]s whether the matter is relevant," which "turns on the meaning of the communication as it could be reasonably understood by [the targeted witness]." Id. at 710. With this question in mind, the Second District concluded that the excluded testimony should have been admitted as both impeachment and substantive evidence. See id. at 711.

Here, during trial, Special asserted that he should be permitted to present evidence that individuals, on behalf of Baux and West Boca, attempted to intimidate Dr. Wolf into changing her expert opinion that AFE was not the cause of Susan's death. According to Dr. Wolf's attorney Bill Pincus, Baux's attorney had told him that "the Defendants had hired a 'nationally-renowned' expert in the field of amniotic fluid embolism ('AFE') who had found 'pervasive evidence' of AFE in the tissue samples taken from the Decedent" and "suggested that Dr. Wolf may not want to 'embarrass herself' by seeking to defend her earlier conclusions (of no evidence of AFE) . . . ." Prior to this conversation, and it is arguable although not fully developed "at the request of a defense attorney," a complaint had even been filed with DOH against Dr. Wolf, which jeopardized her medical license. Dr. Wolf learned of this complaint immediately prior to her deposition with defense counsel, during which she had to discuss and defend her conclusion

- 54 -

that AFE was not the cause of Susan's death. Full evidence concerning this attempted intimidation should be disclosed and explored.

The trial court addressed the alleged intimidation as two separate issues: (1) whether sufficient evidence was presented to introduce into evidence the fact that a disciplinary proceeding had been filed against Dr. Wolf by DOH; and (2) whether individuals had attempted to intimidate Dr. Wolf prior to her deposition. The trial court only allowed Special to proffer Dr. Wolf's testimony on these issues. Although the trial court found the testimony addressing witness tampering with regard to activities occurring prior to Dr. Wolf's deposition to be relevant, it ruled that testimony on this issue was inadmissible because it constituted double hearsay. The trial court also precluded testimony "with respect to the [DOH] investigation . . . [because] I don't believe there's a sufficient evidentiary nexus to allow us to go there [and address witness intimidation] at this point. [Dr. Wolf] doesn't know who filed [the complaint that led to the disciplinary proceeding], and we can surmise who may or may not have, but I don't think we have enough to go there."

The trial court's concern regarding the evidentiary nexus between Dr. Wolf's testimony and the apparent witness intimidation is misplaced. It is clear that a third party with the "authority, consent, or knowledge" of Baux, if not West Boca as well, attempted to influence Dr. Wolf and alter her testimony. See Manuel, 524 So. 2d at 735. No other persons or party would have been privy to,

- 55 -

and interested in, Dr. Wolf's conclusions regarding the cause of Susan's death. Who else would have asked Dr. Wolf to reconsider her earlier conclusions? Who else would have initiated a complaint with DOH against Dr. Wolf? Who else would have had a personal interest in her testimony? The answers to these questions indicate that the defense or someone working on behalf of the defense was responsible for the events that occurred prior to Dr. Wolf's deposition, and that party intended to, and did, exert pressure on Dr. Wolf in an effort to change her opinion. In any event, the evidence should be explored and the truth exposed.

With regard to the dictates of Jost—that the challenged testimony must be relevant and the communication reasonably understood by the targeted witness as an attempt to intimidate—Special appears to have satisfied this standard. First, in its order, the trial court found this testimony to be relevant. Additionally, this testimony concerned the key issue in this case—the cause of Susan's death. Second, although Dr. Wolf may have neither changed her testimony nor been intimidated, she understood the intent of the events preceding her deposition to be an effort to alter her conclusion. Accordingly, the trial court should have stayed the proceedings and addressed the problem and allegations of intimidation at the time they were brought to the court's attention. Judicial proceedings must be free from improper efforts to intimidate witnesses and, when that issue arises, courts must be prepared to respond and react lest we allow justice to be undermined. The

trial court's failure to do so, and thereby ensure that the trial was not tainted by extraneous influences, was not a harmless error. The trial court's failure to admit testimony on this issue amounted to an abuse of discretion.

To the extent that Baux and West Boca allege that this evidence of intimidation is too attenuated to be admitted, I note that evidence of this nature "need not lead inescapably towards a single conclusion to be relevant, it need only make certain facts more probable than not." See McQueeney, 779 F.2d at 921. Here, Special provided sufficient support for the trial court to rule the testimony admissible and deserving of the jury's consideration. Consequently, this testimony should have been admitted as substantive evidence of Baux and West Boca's lack of faith in their defense that AFE caused Susan's death. Most certainly, if further evidence is available, it must be considered in connection with a new trial.

Moreover, if in fact these activities were concerted efforts to intimidate Dr. Wolf, it is appropriate to conclude that they derived from parties who acted with the "authority, consent, or knowledge" of Baux, if not West Boca as well. See Manuel, 524 So. 2d at 735. Neither Baux nor West Boca has provided this Court with a reason to conclude that some other person or party would have had a motive to harass Dr. Wolf as occurred here. Additionally, because the intimidating parties were acting as agents of Baux, the trial court's hearsay concerns are eliminated. Compare Jost, 730 So. 2d at 710 (permitting admission of communications to the

targeted doctor from the defendant's insurance carrier, which is "akin to a communication from [the defendant] . . . [and not akin to] a communications from a third party with no direct interest in the outcome of the case"), with Nagel v. State, 774 So. 2d 835, 838 (Fla. 4th DCA 2000) (ruling that a police officer's testimony was inadmissible because the state did not present evidence that the contested telephone call "was made with appellant's authority, consent, or knowledge").

Based on the relevance of the testimony to both the very core issue of the litigation (the AFE diagnosis), and demonstrated efforts to change or silence contradictory evidence concerning the cause of Susan's death, I would conclude that the erroneous rulings by the trial court amounted to harmful error. The evidence of witness tampering was relevant to the theory of causation espoused and should have been admitted as substantive evidence to discredit those involved in the efforts. The failure of the trial court to admit this testimony constituted an abuse of discretion and this Court should not conclude that there is no reasonable possibility that these errors did not affect the deliberations of the jury and its determination that Baux and West Boca were not responsible for Susan's death. See DiGuilio, 491 So. 2d at 1135.

In conclusion, I would remand this case for a new trial because without the evidence excluded here, the fairness and integrity of this litigation has been compromised.

POLSTON, J., dissenting.

I agree with Justice Pariente's dissent from the majority's decision to adopt the same harmless error standard for both the criminal and civil contexts even though criminal and civil cases are subject to different burdens of proof. The Fourth District Court of Appeal properly held that "harmless error occurs in a civil case when it is more likely than not that the error did not contribute to the judgment." Special v. Baux, M.D., et al., 79 So. 3d 755, 771 (Fla. 4th DCA 2011). I also agree with Justice Pariente's conclusion that the trial court did not err in excluding the pre-deposition comments allegedly made to Dr. Wolf as inadmissible hearsay. However, unlike Justice Pariente and the majority, I do not believe that a new trial is warranted in this case because the improper restriction of Dr. Dildy's cross-examination testimony was harmless.

Reviewing the entire record, it is more likely than not that the trial court's restriction of Dr. Dildy's cross-examination did not contribute to the judgment. The proffered cross-examination is cumulative of other evidence actually presented to the jury regarding the possibility of overdiagnosis of AFE at West Boca because, during Dr. Adelman's testimony, "Special was able to elicit national

statistics showing incidence of AFE diagnosis at West Boca was about 15 times the rate elsewhere." Id. at 757. Moreover and importantly, the proffered cross-examination would have added very little (if any) support to Special's position, especially considering that Dr. Dildy's proffered testimony strongly emphasized that a possible statistical anomaly in all AFE cases at West Boca would not matter here because this case in particular was a case of AFE. As the Fourth District explained,

> [t]he ultimate purpose of the proposed cross-examination was to call into question the hospital's AFE diagnosis by suggesting that the hospital diagnosed that condition about 15 times more than the rate elsewhere. This issue was presented to the jury through the testimony of Dr. Adelman and in part from Dr. Dildy. This evidence allowed the plaintiff's attorney in closing argument to hammer on the significance of the statistical abnormality. During the proffer of Dr. Dildy, he said that if the incidence of AFE at the hospital were accurate, he would be concerned that AFE was being over-diagnosed. Yet, even when confronted with the statistics documenting this possibility, he persisted in his opinion that Susan presented a special case of AFE. He testified, "But this case here, we're talking about, it doesn't matter what all these other cases are, this is this case, and this case is an amniotic fluid embolism."

Id. at 772 (emphasis added).

Accordingly, because I disagree with the majority's adoption and application of the criminal harmless error standard in this civil case, I respectfully dissent.

CANADY, J., concurs.

Application for Review of the Decision of the District Court of Appeal - Certified Great Public Importance

- 60 -

Fourth District - Case No. 4D08-2511

(Palm Beach County)

Gary Mitchell Cohen and Andrew Bryan Yaffa of Grossman Roth, P.A., Boca Raton, Florida, and Philip Mead Burlington and Andrew A. Harris of Burlington & Rockenbach, P.A., West Palm Beach, Florida,

for Petitioners

Michael Keith Mittelmark, Megan Kathleen Zavoina and Kabir Asrani of Michaud, Mittelmark, Marowitz & Asrani, PLLC, Boca Raton, Florida, on behalf of West Boca Medical Center; Irene Marie Porter, Mark Hicks, and Shannon Kain of Hicks, Porter, Ebenfeld & Stein, P.A., Miami, Florida, and Eugene L. Ciotoli of Bobo Ciotoli Bocchino Newman Corsini White & Buigas, P.A., North Palm Beach, Florida, on behalf of Ivo Baux, M.D., PA., and Pinnacle Anesthesia, P.L.,

for Respondents